## UNITED STATES DISTRICT COURT
## FOR THE NORTHER DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MICHAEL L. BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 04 C 1288 |
| | ) |
| CITY OF NORTH CHICAGO and | ) Judge Joan Humphrey Lefkow |
| WAUKEGAN TOWNSHIP, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Michael L. Brown ("Brown") filed a two count First Amended Complaint against

defendants City of North Chicago ("North Chicago") and Waukegan Township, alleging a violation

of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*,

against North Chicago, and a violation of Title II of the ADA against Waukegan Township.

Presently before the court are the motions of North Chicago and Waukegan Township for summary

judgment. For the reasons stated below, the court denies defendants' motions.

### I.     SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

To determine whether any genuine fact exists, the court must pierce the pleadings and assess the

proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part

of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary

judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.*

v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving

party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia,* 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.,* 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## II.    FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF[1]

### A.    The Earnfare Program

In June of 2003, Brown applied to participate in the Earnfare Program through Waukegan Township. Waukegan Township is an Earnfare provider through the State of Illinois and the Illinois Department of Human Services. The Earnfare Program is a program administered by the State of Illinois in which participants are assigned to an entity and, through work performed at that entity's work site, the participant can work off the value of the food stamps received and earn up to an

---

[1] In responding to Brown's Local Rule 56.1 statement of additional facts, Waukegan Township admitted that Brown testified as stated in the paragraphs but denied the accuracy of that testimony. *See* Defendant Waukegan Township's Response to Plaintiff's Statement of Additional Facts at ¶¶ 7-17, 22-23. Waukegan Township did not cite to any evidence of record contradicting the statements asserted in Brown's Local Rule 56.1 statement. As such, these facts are deemed admitted as to Waukegan Township. *See* Local Rule 56.1(b)(3)(C). North Chicago disputed many of the facts asserted in Brown's Local Rule 56.1 statement of additional facts by citing to evidence of record that contradicted Brown's asserted facts. *See* Defendant's Response to Plaintiff's Statement of Additional Facts at ¶¶ 7-10, 12-14, 16-19, 23. Because the court is taking the facts in the light most favorable to Brown, however, the court will only recite Brown's version of those disputed facts. Additionally, North Chicago disputed the facts contained in ¶¶ 11, 15, and 16 of Brown's statement of additional facts on "information and belief," which is not proper at summary judgment. *See Price* v. *Rochford,* 947 F.2d 829, 832 (7th Cir. 1991) (citations omitted) (statements made "upon information and belief" cannot be considered in ruling on a summary judgment motion). Because North Chicago failed to adequately controvert these statements of fact, they are deemed admitted pursuant to Local Rule 56.1(b)(3)(C) for purposes of summary judgment.

additional $294.00 per month while receiving job training. To facilitate the Earnfare Program, Waukegan Township contracts with various entities to be work sites for the participants, including the North Chicago Streets and Water Department. Only clerical or manual labor positions are available through the Earnfare Program.

The Illinois Department of Human Services Food Stamp Employment and Training Manual (the "Manual") sets forth the guidelines for Waukegan Township's administration of the Earnfare Program. The Manual requires Earnfare participants to be "able-bodied adults without dependents who receive food stamps." Physicians retained by the State of Illinois determine whether an Earnfare applicant meets this eligibility requirement.

The Bureau of Employability Development Services pays an Earnfare participant's wages directly to the participant's Illinois Link Card. Earnfare Program assignments are for eighty hours over a six-month period. After completing one assignment through the program, a participant may reapply to the program after they have been out of the program for six months.

North Chicago submitted an application for the Earnfare Program to contract with Waukegan Township. North Chicago's application described the duties to which Earnfare participants would be assigned. North Chicago's application specified that any participants assigned to North Chicago would be involved with and assigned to duties that included "total maintenance of the City as a whole." North Chicago attached to its application a job description that provided the position title as "laborer" and described the job duties as "total city maintenance from clean-up to construction projects." Earnfare participants were to assist North Chicago Street Department's "Street Maintenance I" employees with their daily tasks. The job description for "Street Maintenance Worker I" states that the basic job requirements include the ability to walk, stoop, bend, push, climb,

3

squat and lift at least 75 pounds. North Chicago was not involved in the assessment, selection, or assignment of any participant, nor did North Chicago pay wages to Earnfare participants.

## B.    Brown's Participation in the Earnfare Program

Brown met with William Caldwell, a Waukegan Township caseworker, in July 2003 to discuss Brown's participation in the Earnfare Program. Brown informed Caldwell that he had some health concerns about applying for the Earnfare Program. Specifically, Brown could not do strenuous work such as lifting items heavier than ten pounds. Brown also told Caldwell that he was taking medications for his heart and for depression and showed Caldwell a doctor's note from May 2, 2003 that limited his lifting to ten pounds. Caldwell informed Brown that he could not rely on the doctor's note because it was outdated and asked him if he still wanted to participate in the program. Caldwell instructed Brown to get updated medical restrictions for his conditions and that Brown could try again to qualify for disability benefits, as an earlier application for disability benefits has been denied.

Brown subsequently saw Dr. Ugolini with Healthreach, who did not provide Brown with an updated medical restriction. Brown did not attempt to get an updated medical restriction from any other doctor. Brown also was scheduled for a physical examination at the Lake County Health Department on July 22, 2003 to assess his claim for disability benefits, but he missed that appointment.

Because Brown's State of Illinois Department of Human Services "Report of Incapacity" (Form DPA-183) showed that Brown had no disabilities and was able to work, Caldwell believed that Brown qualified for the Earnfare Program. Initially, Brown received a two-week assignment to mow the lawn at the Staben Center. Pursuant to the 80 hour per month limit on Earnfare work,

4

Brown was off work for the last two weeks in September.

Brown then returned to see Caldwell at the end of September 2003 for his next assignment. Caldwell informed Brown that his next assignment would be to North Chicago's Street Department in a manual labor position. Caldwell also told Brown that his physical complaints of a heart problem, back problem, and acid reflux would not be a problem in this position because Brown would only be picking up paper along the streets. Caldwell had made site visits to North Chicago previously and had never seen Earnfare participants performing any work that required heavy lifting. Caldwell also told Brown that he should not tell the staff at North Chicago about his health problems.

A few days before he was scheduled to start working at North Chicago, Brown met with John McKnight, North Chicago's Street Department Commissioner. Brown told McKnight about his health concerns, and McKnight informed Brown that his health concerns would not be a problem because he would be picking up paper along the streets.

On October 1, 2003, his first day of work with North Chicago, Brown informed Roger Haacke, a North Chicago Street Department employee with whom he was assigned to work, about his heart and back problems. Haacke responded that work was not going to be hard. Brown's tasks on his first day included sweeping the garage floor and cleaning a table.

On his second day, Brown was scheduled to work picking up litter with another Earnfare participant, but Haacke instead assigned Brown to carry metal beams weighing approximately forty pounds. Brown told Haacke that he was unable to carry the beams because of his health condition. Haacke, however, made him perform this task anyway. Brown also swept the floors. After carrying the beams, Brown informed North Chicago Street Department Foreman Gabriel Albarran about his

5

health problems and that Haacke made him carry the beams.

On another day, Haacke assigned Brown to move fifty-pound containers of paint. After informing Haacke about his health problems again, Haacke made Brown perform the task. Brown then informed Albarran about his assignments from Haacke, but Albarran did nothing in response.

On October 6, 2003, Brown was assigned to put tree branches, some of which weighed up to fifty pounds, in a grinder. Brown informed the North Chicago employee with whom he was working about his health problems, but that employee said nothing in response.

Two days later, on October 8, Brown was assigned to pick up litter, but Albarran gave him an assignment of separating bricks and stones from a pile of asphalt, which was a task typically performed by a machine. Brown immediately informed Albarran that he was unable to do the job because of his medical condition, but Albarran made him do it anyway. Brown also informed Haacke that he was unable to perform this task because of his health concerns, but Haacke did nothing in response. While Brown was separating the stones from the asphalt, Albarran stood outside and laughed at him. Albarran then told another employee to dump more asphalt and stones onto Brown's pile.

Brown then went to McKnight and informed him that Albarran had required him to separate the stones from the asphalt. Brown also reminded McKnight of his disabilities and restrictions on bending and lifting. Brown also mentioned his heart condition, which alerted McKnight that Brown should not be a part of the Earnfare Program because he had a handicap. McKnight subsequently contacted the Earnfare office about Brown. McKnight did not expect Brown to return to North Chicago after he had contacted the Earnfare office. McKnight had never asked Brown about his heart condition or attempted to assign Brown to tasks that did not involve heavy labor, as "[t]hat

6

would be like catering to a handicap." Plaintiff's Statement of Additional Facts at ¶ 20.

The following day, October 9, 2003, Brown reported for work but before he started any work, he received a call from Aly Echevarria, a caseworker for Waukegan Township. Echevarria told Brown to come to her office. When Brown reported to her office, Echevarria informed him that he was no longer qualified to work in the Earnfare Program because of his health condition and that he would need to see another doctor and fill out more forms to apply again for disability benefits.

On January 2, 2004, McKnight sent a letter to Waukegan Township stating, in part, "Going forward, I ask that all Waukegan Township Earnfare clients sent to the City of North Chicago Street Department be in good physical condition." *Id.* at ¶ 21.

### C. Brown's Disabilities

Brown has identified his disabilities as mitral valve prolapse, gastroesophageal reflux disease, and osteoarthritis. Brown was diagnosed with his mitral valve prolapse and gastroesophageal reflux disease in 1999. He was not diagnosed with osteoarthritis until 2004, after his assignment to North Chicago. Between March of 2003 and September 30, 2003, Brown had complaints of occasional back pain, which he incurred by picking up items weighing over ten pounds and by standing in one position for several hours.

### D. Disability Benefits

Brown had applied for disability benefits through the Social Security Administration ("SSA") in March of 2003. The basis of that claim for benefits was back pain, a heart condition, and acid reflux disease. When he completed the paperwork for social security benefits, he stated that he was unable to work and that he could only lift ten pounds.

In June 2005, Brown's request for social security benefits was approved. The SSA

7

determined that Brown's disability began in January 2005 and that his disability was for psychiatric reasons, neuropathy, and a learning disability.

## III. DISCUSSION

North Chicago moves for summary judgment, arguing that Brown cannot show that he is protected by the ADA because he was neither a job applicant nor an employee of North Chicago. North Chicago argues further that Brown is not disabled within the meaning of the ADA and that Brown was not otherwise qualified to perform the essential functions of the position at the North Chicago Street Department with or without reasonable accommodation. Finally, North Chicago argues that Brown's request for an accommodation would have caused undue hardship on North Chicago's Street Department.

Similarly, Waukegan Township argues that Brown is not a qualified individual with a disability because he has failed to present evidence that he was disabled under the ADA. Waukegan Township also asserts that Brown is judicially estopped from proceeding on his ADA claim because of his application for benefits with the SSA and that Brown did not meet the essential eligibility requirements for participation in the Earnfare Program. Waukegan Township further contends that Brown has failed to show that Waukegan Township denied him participation in the Earnfare Program or any other program administered by the Township. The court will address each argument in turn.

### A. "Employee" within the Meaning of the ADA

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42

8

U.S.C. § 12112(a); *Basith* v. *Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). North Chicago argues that it is entitled to summary judgment because Brown was not an employee within the meaning of the ADA.

Title VII defines an "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). Unsurprisingly, this definition has been called "unhelpful[]" and "circular." *See Pietras* v. *Bd. of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir. 1999); *O'Connor* v. *Davis*, 126 F.3d 112, 115 (2d Cir. 1997), respectively. It is well-settled, however, that when Congress uses the term "employee" without defining it, courts should presume that Congress had in mind "the conventional master-servant relationship as understood by the common-law agency doctrine." *O'Connor*, 126 F.3d at 115, *quoting Nationwide Mut. Ins. Co.* v. *Darden*, 503 U.S. 318, 322-23, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992). Thus, Brown must demonstrate the existence of an employment relationship with North Chicago in order to prevail against North Chicago on his ADA claim.

To determine whether a person is an employee or an independent contractor, the court applies the "economic realities test which involves an application of the general principles of agency to the facts." *Knight* v. *United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991). In particular, the court considers

> (1) The extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectation.

*Worth* v. *Tyer*, 276 F.3d 249 at 263 (7th Cir. 2001), *citing Knight*, 950 F.2d at 378-79. Of these

9

factors, the employer's right to control the worker's actions is the most important. *Id.*, *citing Knight*, 950 F.2d at 378. "If an employer has the right to control and direct the work of an individual, not only as to the result achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.*, *quoting Spirides* v. *Reinhardt*, 613 F.2d 826, 831-21 (D.C. Cir. 1979).

With regard to the first factor, the extent of North Chicago's control and supervision over Brown, the undisputed facts show that Brown reported to work at North Chicago and that North Chicago assigned Brown to various tasks that he was to accomplish each day, *i.e.*, sweeping the floor, moving beams and paint buckets, and separating stones from asphalt. Additionally, despite Brown's protestations that he was unable to perform several of these tasks, North Chicago employees required that he complete the tasks. As such, North Chicago exercised control and supervision over Brown in his performance of his daily responsibilities. This favors a finding that Brown was an employee of North Chicago.

Turning to the second factor, the kind of occupation and the nature of the skills involved, Brown's various job assignments at North Chicago may be categorized as unskilled, and accordingly, it is safe to assume that Brown was afforded little discretion in the manner in which he performed these tasks. One of the purposes of the Earnfare Program also was to provide job training for its participants. This factor likewise favors a finding that Brown was an employee of North Chicago.

As to the third factor, North Chicago was responsible for the costs of its sanitation department, as well as the equipment used by Brown. North Chicago has not offered evidence or argued that Brown bore any responsibility in this regard. This factor, therefore, also favors a finding that Brown was an employee of North Chicago.

The crux of North Chicago's argument as to why it was not Brown's employer is the fourth factor: the method and form of payment and benefits. North Chicago did not pay Brown any wages. In fact, the State of Illinois' Bureau of Employability Development provided Brown with food stamp benefits and would only pay Brown wages if he worked in excess of his monthly food stamp benefit. North Chicago did not set Brown's rate of pay; it was not responsible for payments to him; and it was not responsible for any federal or state tax withholding or social security deductions. The fourth factor favors a finding that Brown was not an employee of North Chicago.

The fifth and final factor, the length of job commitment and/or expectation, also favors a finding that Brown was not an employee of North Chicago. The length of Brown's assignment to North Chicago was limited to forty hours. Even if North Chicago wanted to extend the length of this assignment, the Manual of the Earnfare Program limited an Earnfare participant to working no more than eighty hours in a month, and participation in the Earnfare Program is limited further to six months in a twelve month period. Similarly, North Chicago did not decide when Brown's assignment would begin or even to hire Brown.

The balance of the five factors demonstrates that Brown was an employee of North Chicago, particularly because North Chicago exercised significant control over Brown.[2] That Brown was also

---

[2] North Chicago asserts that Brown's assignment to North Chicago through the Earnfare Program was more akin to an individual performing community service than to a temporary employee. North Chicago does not cite to any authority or elaborate as to why this characterization of Brown's assignment would preclude Brown from holding North Chicago liable under the ADA. There is no dispute that Brown received compensation in the form of food stamp benefits for his work at North Chicago. As such, he was not a volunteer, which would otherwise likely preclude Brown from holding North Chicago liable under the ADA. *Compare Pietras,* 180 F.3d at 473 ("[A]n employement relationship within the scope of Title VII can exist even when the putative employee receives no salary so long as he or she gets numerous job-related benefits."); *with Henderson* v. *YMCA,* No. 05-3179, 2005 WL 3115461, at *1 (C.D. Ill. Nov. 18, 2005) ("Henderson was a volunteer whose only remuneration came through 'SCSEP,' a social service program of the AARP. Because YMCA did not pay Henderson a salary or other wages, Henderson cannot bring suit under Title VII."). And North Chicago has not argued or demonstrated that Brown's compensation through the Earnfare Program was too insignificant to establish an employment relationship.

an employee of Waukegan Township is not fatal to his claim against North Chicago, as whether a joint employer theory is applicable to discrimination cases is an unsettled question in this Circuit. *See Alexander* v. *Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 n.2 (7th Cir. 1996) ("[W]e continue to leave open the question that went unanswered in *Schrock*, 810 F.2d at 660, *i.e.*, whether an employee of employer *X* may bring a Title VII action against employer *Y* when *Y* is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer *X*."). The Seventh Circuit has recognized joint employer status between a temporary services agency and its client in the context of labor law, where "two employers 'exert significant control over the same employees.'" *Nat'l Labor Relations Bd.* v. *Western Temporary Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987) (citations omitted).

The joint employer theory of liability is equally applicable in the context of Title VII and the ADA. *See Piano* v. *Ameritech/SBC*, No. 02 C 3237, 2003 WL 260337, at *5 (N.D. Ill. Feb. 5, 2003) ("This court concludes that the joint employer theory should apply in cases in which an individual is employed by a temporary employment agency, but suffers discrimination by the employer to which he or she is assigned, where that employer exerts a significant amount of control over the individual."). To hold otherwise would be to permit an employer that would otherwise be subject to the ADA to avoid liability for its discriminatory conduct while maintaining control over the employees to which it was assigned merely by virtue of their status as temporary employees. Such a result would conflict with the remedial purposes of the anti-discrimination statutes and, in the context of the Earnfare Program, the goal of providing participants valuable work experience and training. Because the economic realities test favors a finding that Brown was an employee of North Chicago, the court cannot say that, as a matter of law, Brown was not North Chicago's employee.

12

## B. Brown's Social Security Application

Waukegan Township argues that Brown is judicially estopped from claiming that he is a "qualified individual" within the meaning of the ADA because he stated that he was unable to work in his application for disability benefits with the SSA. As recognized by Brown, however, judicial estoppel only applies when a litigant has "successfully argued" a contrary position in another proceeding. *Johnson* v. *ExxonMobile Corp.*, 426 F.3d 887, 891 (7th Cir. 2005). Brown did not receive Social Security benefits based on his March 2003 application. As a consequence, he is not estopped from proceeding on his ADA claim.

## C. Brown's Claim Against North Chicago

To establish a claim of disability discrimination against North Chicago, Brown may proceed under the direct or the indirect method. *Buie* v. *Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004), *citing Robin* v. *Espo Engineering Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000). Under the direct method, there are two types of evidence: direct evidence and circumstantial evidence. *Id.* "The former 'essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.'" *Id.*, *quoting Rogers* v. *City of Chicago*, 320 F.3d 748 at 753 (7th Cir. 2003). "The latter is evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Id.* Under the indirect method, Brown must first establish a *prima facie* case of discrimination by showing that he is disabled within the meaning of the ADA, that he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that he suffered from an adverse employment action because of his disability. *Nese* v. *Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005), *citing Byrne* v. *Board of Educ., School of West Allis-West Milwaukee*, 979 F.2d 560 (7th Cir. 1992). If Brown establishes a *prima facie* case of discrimination,

13

the burden shifts to North Chicago to articulate a nondiscriminatory reason for the adverse employment action. *Buie*, 366 F.3d at 503, *citing Dvorak* v. *Mostardi Plass Assoc., Inc.*, 289 F.3d 479, 485 (7th Cir. 2002). If North Chicago meets its burden, Brown must then prove by a preponderance of the evidence that North Chicago's proferred reasons were a pretext for discrimination. *Id.*

      1.     Brown Was Disabled Within the Meaning of the ADA

North Chicago argues that Brown's ADA claims must fail because he failed to present evidence that he was disabled under the ADA. Brown, however, asserts to the contrary that the defendants are liable because they regarded Brown as having a physical or mental impairment that substantially limits him in a major life activity.

The ADA defines "disability," "with respect to an individual," as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "A person is 'regarded as disabled' when the employer, rightly or wrongly, believes that []he has an impairment that substantially limits one or more major life activities." *Cigan* v. *Chippewa Falls Sch. Dist.*, 388 F.3d 331, 335 (7th Cir. 2004), *citing Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999). If, however, "the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute." *Mack* v. *Great Dane Trailers*, 308 F.3d 776 at 782 (7th Cir. 2002).

Brown suffers from mitral valve prolapse, gastroesophageal reflux disease, and osteoarthritis.

14

At the time he worked for North Chicago, he had difficulty lifting more than ten pounds. "A medical condition however, by itself, does not constitute a disability under the [ADA]." *Nese*, 405 F.3d at 642-43, *citing Toyota Motor Mfg., Ky., Inc.* v. *Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002); *Krocka* v. *City of Chicago*, 203 F.3d 507 (7th Cir. 2000); *Moore* v. *J.B. Hunt Transp., Inc.*, 221 F.3d 944 (7th Cir. 2000). To show that he was disabled within the meaning of the ADA, Brown must show that defendants were aware of his impairments and that they believed that Brown was substantially limited in a major life activity because of the impairment. *Id.* at 643, *citing Skorup* v. *Modern Door Corp.*, 153 F.3d 512 (7th Cir. 1998).

Brown asserts that North Chicago believed that Brown was substantially limited in the major life activity of working.[3] "To be a substantial limitation on his ability to work, the limitation 'must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA.'" *Id.*, *quoting Skorup*, 153 F.3d at 515. When Brown complained to McKnight that Albarran was forcing him to perform tasks that he was unable to do and reminded McKnight of his heart condition, McKnight contacted Waukegan Township because he did not believe that Brown should participate in the Earnfare Program because he had a handicap. McKnight did not inquire as to what tasks Brown was able to perform. Rather, he assumed that Brown was unable to fill any position with North Chicago or any of the broad range of positions in the Earnfare Program that required manual labor because of his medical limitations. That McKnight believed that Brown was unable to fill any position with North Chicago was borne out further by McKnight's subsequent letter to Waukegan Township requesting that it only send Earnfare participants who were in "good physical condition." Based on this evidence, a reasonable jury could

---

[3]Brown also asserts that he is substantially limited in the major life activities of bending and lifting.

15

conclude that North Chicago believed that Brown was substantially limited in the major life activity of working.

    2.  Direct Evidence of Discrimination

  Although North Chicago only argues that Brown cannot establish a *prima facie* case of discrimination under the indirect method, there is sufficient direct evidence from which a reasonable jury could conclude that North Chicago had Brown removed from his assignment because of his disability. McKnight testified during his deposition that when Brown informed McKnight that he had a heart condition, McKnight was alerted immediately to the fact that Brown should not be a part of the Earnfare Program because of his handicap. When McKnight called Waukegan Township about Brown's assignment with North Chicago, McKnight expected that Brown would be assigned elsewhere but not with North Chicago. And McKnight never asked Brown about his heart condition or otherwise attempted to assign Brown to tasks that did not require heavy labor. As McKnight explained in his deposition, "That would be like catering to a handicap." McKnight Dep. at 39-40. Additionally, McKnight later sent a letter to Waukegan Township requesting that Earnfare participants sent to North Chicago be in "good physical condition." The evidence further establishes that but for his disability, North Chicago would not have sought to have Brown removed from his assignment because he was working out fine until Brown complained to McKnight about his medical conditions. As a consequence, Brown has presented sufficient direct evidence of discrimination such that North Chicago is not entitled to summary judgment.

    3.  Discrimination Under the Indirect Method

  Even considering North Chicago's arguments under the indirect method, North Chicago's motion for summary judgment fails. North Chicago argues that Brown's ADA claims must fail

16

because he cannot establish that he could have performed the essential functions of his Earnfare job with or without a reasonable accommodation. "[A]n essential function must be a fundamental duty of the job." *Basith*, 241 F.3d at 929, *citing* 29 C.F.R. § 1630.2(n). North Chicago asserts that the essential functions of an Earnfare assignment with North Chicago require that an Earnfare participant be able to walk, stoop, bend, push, climb, squat and lift at least 75 pounds. The facts taken in the light most favorable to Brown, however, do not support this assertion.

North Chicago's application to the Earnfare Program specified that any participants assigned to North Chicago would be involved with and assigned to duties that included "total maintenance of the City as a whole." North Chicago attached to its application a job description that provided the position title as "laborer" and described the job duties as "total city maintenance from clean-up to construction projects." Earnfare participants were to assist North Chicago Street Department's Street Maintenance Worker I employees with their daily tasks.

North Chicago equates the job responsibilities of its Street Maintenance Worker I with the responsibilities of the Earnfare participants, but the record shows that Earnfare participants were merely assisting the Street Maintenance Workers. The record further shows that McKnight testified at his deposition that North Chicago did not require the same abilities of its Earnfare participants as its Street Maintenance Workers. The job description for Street Maintenance Worker I provided that the basic job requirements included the ability to walk, stoop, bend, push, climb, squat and lift at least 75 pounds. The Street Maintenance Worker I job description also required a high school diploma or equivalent; a valid Illinois CDL Drivers License or the ability to obtain one within six months of employment; working knowledge of North Chicago's boundaries; the ability to operate street repair and maintenance equipment; and the ability to work in all types of environments and

17

weather conditions. North Chicago offers no explanation as to why Earnfare participants did not need to meet these requirements of the Street Maintenance Worker I job description if it did, in fact, require participants to have the ability to walk, stoop, bend, push, climb, squat and lift at least 75 pounds.[4] McKnight even conceded that the Street Maintenance Worker I job description did not apply to Earnfare participants at North Chicago. *See* McKnight Dep. at 29. Drawing all reasonable inferences in Brown's favor, North Chicago did not require its Earnfare participants to meet the requirements of North Chicago's Street Maintenance Worker I position.

This inference also is supported by the employer application submitted by North Chicago to the Earnfare Program. The application described the job duties as "total city maintenance from clean up to construction projects." In the "special issues" portion of the job description, North Chicago specified that a physical exam was not required and that safety boots were required. North Chicago did not submit its Street Maintenance Worker I job description with its application or further detail the job responsibilities of its Earnfare participants. Moreover, McKnight informed Brown before he started working at North Chicago that he would only be picking up paper along the streets. And North Chicago has not offered evidence showing that bending or heavy lifting were assigned to Earnfare participants other than Brown or otherwise suggesting that they were essential functions of an assignment with North Chicago. As such, North Chicago has not demonstrated that heavy

---

[4]North Chicago relies on a rather ambiguous statement of McKnight from his deposition for the proposition that there was no position at North Chicago's Street Department that would not require the ability to engage in extensive walking, stooping, bending, and heavy lifting. *See* North Chicago Memo. of Law at 10. During his deposition, McKnight was asked, "And, again, would they need the - - Earnfare participants need the ability to walk, stoop, bend, pull, push, climb, squat, and lift at least 75 pounds?" McKnight Dep. at 29. McKnight responded, "I'm sure they would have to have these abilities, but it's not required of them from the City's standpoint." In other words, McKnight assumed that Earnfare participants would meet these requirements but North Chicago did not, in fact, have such a requirement for its Earnfare participants. Drawing the reasonable inference in Brown's favor, this statement does not support North Chicago's asserted fact that the ability to walk, stoop, bend, pull, push, squat, and lift and least 75 pounds was essential to an Earnfare assignment at North Chicago.

18

lifting and bending were essential functions of an Earnfare participant's assignment at North Chicago such that it is entitled to judgment as a matter of law. Because Brown was able to pick up litter, he has shown that he met the essential functions of the job without a reasonable accommodation. It is therefore unnecessary for the court to consider whether Brown's proposed accommodation was reasonable or whether the proposed accommodation would cause North Chicago undue hardship.[5]

Finally, North Chicago argues that it did not cause Brown's termination from the Earnfare Program. There appears to be no dispute that North Chicago was not the final decision-maker with respect to Brown's participation in the Earnfare Program. At the same time, North Chicago has failed to argue or assert that Brown's removal from North Chicago was not an adverse employment action. McKnight contacted Waukegan Township with the expectation that Brown would be removed from his position with North Chicago because of his heart condition, and Brown was removed. Taking the facts in the light most favorable to Brown, North Chicago has failed to demonstrate that it is entitled to judgment as a matter of law. North Chicago's motion for summary judgment, therefore, is denied.

## D. Brown's Claims against Waukegan Township

### 1. Discrimination Under Title II of the ADA

To prevail on his claim against Waukegan Township under Title II of the ADA, Brown must prove that "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionately impacts

---

[5]North Chicago also asserts in its Memorandum of Law that Brown's continued participation in the Earnfare Program would pose a direct threat to the health and safety of other individuals in the workplace. *See* North Chicago's Memo. of Law at 12. North Chicago did not offer any facts in its Statement of Material Facts with regard to this assertion. Because all material facts must be included in a party's Local Rule 56.1 Statement, the court will disregard this asserted fact.

19

disabled people." *Washington* v. *Indiana High School Athletic Ass'n, Inc.*, 181 F.3d 840 at 847 (7th Cir. 1999). Waukegan Township argues that Brown's ADA claim must fail because he was not a qualified individual with a disability; he did not meet the eligibility requirements to participate in the Earnfare Program; and Waukegan Township did not deny him participation in the Earnfare Program.

          2.      Waukegan Township Regarded Brown as Disabled

As with North Chicago, the facts taken in the light most favorable to Brown show that Waukegan Township regarded Brown as disabled. Waukegan Township caseworkers repeatedly suggested to Brown that he apply for disability benefits, which necessitate the inability to work. When Brown reported to Echevarria, Echevarria told him that he was no longer qualified to work in the Earnfare Program because of his health condition. A reasonable jury could conclude from this evidence that Waukegan Township also believed that Brown was substantially limited in the major life activity of working because it determined that Brown was ineligible to work in any of the jobs to which it assigned Earnfare participants.

          3.      Brown's Eligibility for the Earnfare Program

Likewise, the facts taken in the light most favorable to Brown establish that he was eligible to participate in the Earnfare Program. While Earnfare participants must be "able-bodied," Waukegan Township has not offered evidence establishing the definition of "able-bodied" for purposes of the Earnfare Program or that Brown was not "able-bodied." The evidence shows that physicians retained by the State of Illinois determine whether an Earnfare applicant meets this eligibility requirement. There is no evidence, however, that any physician determined that Brown was not eligible. Moreover, Brown's State of Illinois Department of Human Services "Report of

20

Incapacity" (Form DPA-183) showed that Brown had no disabilities and was able to work. Additionally, Brown was denied disability benefits by the State of Illinois prior to his participation in the Earnfare Program. Thus, the court cannot say that Waukegan Township is entitled to judgment as a matter of law because Brown was not eligible to participate in the Earnfare Program.

    4.      Waukegan Township Denied Brown's Participation in the Earnfare Program

Finally, Brown and Waukegan Township have offered contradictory facts with regard to the circumstances of his meeting with Echevarria after his assignment to North Chicago. Thus, summary judgment is inappropriate because there are genuine issues of material fact as to whether Echevarria told Brown that he was no longer qualified for the Earnfare Program because of his health conditions. The court, therefore, denies Waukegan Township's motion for summary judgment.

## ORDER

For the reasons stated above, the court denies North Chicago's motion for summary judgment [#58] and Waukegan Township's motion for summary judgment [#64]. This matter is set for a hearing on status on July 18, 2006 at 9:30.

ENTER:

                        JOAN HUMPHREY LEFKOW
                        United States District Judge

Dated: June 28, 2006